PUTNAM LUMBER COMPANY, a Corporation, JOE RAULESON and DEWEY ADKINSON v. R. L. BERRY.

2 So. (2nd) 133
En Banc
Opinion Filed April 15, 1941
Rehearing Denied May 26, 1941

596

*T. J. Swanson,* for Plaintiffs in Error Joe Rauleson and Dewey Adkinson;

*Marks, Marks, Holt & Yates, Harry T. Gray* and *L. W. Duval,* for Plaintiff in Error Putnam Lumber Company;

*Frank R. Greene, S. Whitehurst Sons* and *C. A. Savage, Jr.,* for Defendant in Error.

PER CURIAM.—This writ of error brings for review final judgment awarding plaintiff, R. L. Berry, damages for personal injuries sustained.

Plaintiff's one-count declaration was brought against the Putnam Lumber Company, Joe Rauleson and Dewey Adkinson.

The declaration alleged in substance that on or about February 25, 1937, at or near Gum Slough in Marion County, Florida, defendants were loading logs, cut for Putnam Lumber Company, upon motor trucks to be hauled to the sawmill and lumber yard of Putnam Lumber Company in Shamrock, Florida; that plaintiff was employed by Putnam Lumber Company as a truck driver in hauling logs from various points in the State to its sawmill and lumber yard in Shamrock, and plaintiff was by said defendant on said date instructed to drive one of defendant's trucks to said Gum Slough, pick up a load of logs and haul them to defendant's plant in Shamrock; that plaintiff had never before been to said loading point and had no opportunity to inspect the condition and sufficiency of the machinery and equipment there used by defendants in loading the logs; that the equipment, machinery and appliances there used for loading logs was unsafe, defective, inadequate and dangerous to persons at or near the loading point, in that the "skidder" and the engine operating it were of inadequate size and power to lift large logs such as were then and there being loaded without snatching or jerking them upward by racing the engine and applying the power suddenly and violently, and the tree to which said machinery was attached,

and which was used as a mast in lifting and loading said logs upon said trucks, was weak, unsafe and defective, and the guy wires or cables attached to said tree to strengthen it and to take up a large part of the stress and strain, were old, worn and weak and insufficient in number and strength; which facts were unknown to plaintiff and were not observable by him, but were known to, or in the exercise of ordinary care and diligence should have been known, to each of defendants; that it was the duty of defendant Putnam Lumber Company, as plaintiff's employer and of defendants Rauleson and Adkinson as participators and co-actors with Putnam Lumber Company in said loading operation to use reasonable care to provide plaintiff with a reasonably safe place to work at said loading point, and to use reasonably safe and adequate appliances and equipment for the loading operations being carried on, and to warn plaintiff of the latent dangers before or upon his arrival at said loading point; but each of said defendants negligently and carelessly failed to perform their several duties toward plaintiff, consequently plaintiff arrived with defendant's truck at said loading point in the early morning of said day, and was and remained without knowledge or notice of said conditions and dangers, and without opportunity to discover them after his arrival, and while a large cypress log was being loaded by defendants on another truck of Putnam Lumber Company, one or more of the guy wires or cables gave way by reason of their worn and weakened condition and insufficiency, and said tree was snapped off at the butt by reason of its defective condition, under the excessive and dangerous strain exerted upon them by the operation of the "skidder" in the manner above described, while lifting said log to load it upon said truck, causing the top of said tree to be pulled violently to the ground toward plaintiff who was then and there waiting with his truck in the course of

his employment and a branch of said tree struck and tore off plaintiff's left arm between the shoulder and elbow, which injury was caused solely by said negligence of defendants; that as a result of said injury plaintiff for a long time suffered and still suffers intense and excruciating pain, both mental and physical; that while under treatment for his injuries by physicians and surgeons of Putnam Lumber Company, plaintiff was provided with and directed to take certain sedative drugs to ease said pain; that an infection called gas gangrene set up in plaintiff's arm and shoulder despite the treatment for many months by physicians of Putnam Lumber Company, so that it became necessary to remove, by successive operations, the remaining bones and flesh of plaintiff's left arm and shoulder, including the left shoulder blade; that the continued administration of said sedative drugs created a mental derangement of plaintiff and an addiction to such drugs, which plaintiff was unable to control with the result that he was committed to an insane asylum for treatment of such conditions, and has only recently recovered therefrom; that plaintiff is totally and permanently disabled from following his usual or any gainful occupation, and plaintiff has lost and will continue throughout his life to lose, large sums of money, which he would otherwise have earned, and has expended and will expend large sums of money for medical and surgical care and medicines, and plaintiff claims $20,000.00 damages.

Demurrers to the declaration were overruled, and motions to amend were denied.

Putnam Lumber Company filed twenty-seven pleas. In addition to the pleas denying allegations of the declaration, there were also pleas of not guilty, contributory negligence, that the persons loading the logs were not agents, servants or employees of Putnam Lumber Company but were independent contractors, assumption of risk and release.

Demurrer to pleas numbered 2, 1, 21, 22, 23, 24, 25 and 26 was sustained with permission to amend pleas numbered 2, 24 and 26.

Pleas numbered 2 and 24 were amended, and thereafter demurrer was sustained to amended plea No. 24 on the ground that all material facts averred therein were provable under the general issue.

No pleas were filed by defendant Dewey Adkinson. Defendant Joe Rauleson filed twenty-seven pleas, substantially like those of Putnam Lumber Company.

Demurrer to his pleas numbered 19, 21, 22, 23, 24 and 25 was sustained.

Plaintiff filed a replication stating that the release plead by defendants was not plaintiff's deed in that when he signed it he was under the influence of sedative drugs administered by defendant's physician and had been for some time prior thereto, and did not know that he had signed the release until many months afterwards.

Demurrers to the replication were overruled, and a rejoinder was filed by defendant Joe Raulerson denying every allegation contained in the replication and asserting that plaintiff was fully aware of what he was doing when he signed the release.

Trial was had before a jury. A motion for directed verdict at the close of plaintiff's testimony was denied. The jury returned a verdict in favor of plaintiff and assessed his damages at $12,000.00.

Motions for new trial and in arrest of judgment were denied. Thereafter final judgment in favor of plaintiff was entered upon the verdict.

The method of loading logs employed here may be described in this manner: The logs, having been cut and "skidded" out of the swamp, were piled near the rig tree, which was used as a mast by means of which logs were

hoisted. This rig tree was approximately 50-60 feet high and 24-26 inches thick at the butt. To strengthen and steady the rig tree, one 3/4 inch and two 5/8 inch steel cables were attached to it 30-50 feet from the ground. The "skidder," the machine furnishing the power for raising the logs, was 150 feet from the rig tree. The guy lines or cables were designated as right quarter guy, left quarter guy and center back guy, and were located on the right, on the left and on the opposite side of the rig tree from the "skidder." From a revolving drum on the "skidder" a 5/8 inch cable was carried to the rig tree where it was passed through the loading "block." This loading "block" was attached to a short 12-foot cable, called a "sling." The other end of the 'sling" was fastened to the rig tree approximately 18 inches below the point where the three guy lines were attached. The "sling" was used to permit a log to be lifted a sufficient distance from the body of the rig tree so that a truck could be backed under the log while suspended in the air, without backing into the rig tree, and have the log lowered onto the truck. When one end of the "skidder" cable was attached to a log and strain applied on the line to raise the log, the "sling" permitted the 'block" and log to pull away from the rig tree some eight to ten feet. Having hoisted a log eight or ten feet into the air, the "skidder" crew would direct the truck to be placed into position to receive the log. When the truck was so placed the "skidder" crew lowered and loaded the log on the truck, released the "skidder" line, and ordered the truck to move out until another log could be hoisted into position to load. Several logs, depending on their size, would thus be loaded on one truck.

It was during a loading operation such as that described above that plaintiff Berry received his injuries. It is contended by defendants that the loading operation in its entirety

was being done by Joe Rauleson and Dewey Adkinson, owners of the timber, who sold it to Putnam Lumber Company, and contracted, as independent contractors, to load the logs on the trucks of Putnam Lumber Company. The only evidence that Rauleson and Adkinson were independent contractors in the loading operation was the verbal testimony of defendants' witnesses, no written contract having been produced. From the description given of the loading operation, it is seen that for each log loaded on the truck of the Putnam Lumber Company, the truck driver, an employee of the Putnam Lumber Company, must back his truck under the suspended log to have it placed on the truck by the top loader, then after the log has been properly placed, must pull the truck forward until another log can be hoisted into position for loading. The act of backing the truck under the suspended log and pulling the truck forward after the log has been loaded are just as much a part of the loading operation as is the act of hoisting the log into position and the act of placing the log on the truck by the top loader. Even if the verbal testimony that Rauleson and Adkinson were independent contractors for the loading operation be taken as true, yet the manner in which the logs were actually loaded on the trucks showed that it was an operation which required the active coöperation and participation of both the Putnam Lumber Company, through its employees, and Rauleson and Adkinson, through their employees; and neither could load the logs on the trucks by the method employed there without the active coöperation, assistance and participation of the other. The Putnam Lumber Company was therefore a participant in fact with Rauleson and Adkinson in the loading of the logs.

There are other methods of loading logs on trucks besides the one employed here. In most of the other methods the truck remains stationary from the beginning to the end of

the loading operation, and the truck driver is not required to be in his cab, but may retire to a place of safety until the loading operation is completed and his truck is ready to go. If such method had been employed here there might have been some basis for the contention that the loading operation was being performed in its entirety by Rauleson and Adkinson. But the loading operation employed here required the truck driver to remain at his wheel, and to back his truck under each log after it was lifted to the proper height, then after each log was loaded to pull his truck forward and wait until another was lifted to the proper height. Employing this method of loading logs made the Putnam Lumber Company an active participant in the act of loading logs, and liable with Rauleson and Adkinson for any act of negligence that injured, or that contributed with an act or acts of negligence by Rauleson and Adkinson toward the injury of an employee of the Putnam Lumber Company.

There is a division in the authorities as to whether the master is liable to his servant where the instrumentality causing the injury is neither owned nor controlled by the master, but used by his direction. Those authorities holding that the servant may recover have sounder reasoning to support them. We find the following in 3 Labatt's Master & Servant (2nd ed.) 2835, Sec. 1073:

"The broad ground relied upon is simply that, as between a servant and his employer, all appliances which he is authorized or directed to use ought, in fairness, to be placed upon the same footing as those which actually belong to the employer. In other words, the owner of the appliance and his servants are, for the purpose of determining the injured person's right of action, treated as being constructively the agents of that person's employer for the performance of a non-delegable duty incumbent on the latter. The mere fact

that the employer, having no control over the appliance, is unable to remedy defective conditions is, in this point of view, manifestly insufficient to absolve him, since he always has in his power to safeguard his servants by refraining from giving them orders which will put them in a position where their safety will be imperiled by those conditions. . . .

"The present writer ventures to express the opinion that the decisions which declare the master to be liable in cases of this type are more consistent than the others with those general conceptions of public policy which are the ultimate foundation of his obligations to his servants. In many, perhaps most, instances there is no real ground for contending that his want of control over an instrumentality constitutes a serious obstacle to his obtaining sufficient knowledge of its condition to enable him to see whether it will unduly endanger his servants or not, and there would, therefore, be no hardship or injustice in requiring him to make such investigations as may be necessary for that purpose. Even where an adequate examination by his own employees is practically impossible,—as, where the injury was caused by defects in the track of a railway not belonging to him,—it seems not an unreasonable application of the doctrine of nondelegable duties to treat the servants of the owner as his agents. If he desires to protect himself from the consequences of the negligence of persons not in his service, or under his supervision, it is easy for him to do so by making specific arrangements with their master for indemnification in the event of his being obliged to pay damages. *To relegate the servant to his action against the party who owns the instrumentality must, in many cases, be productive of serious inconvenience, and will occasionally deprive him of all remedy.*" (Emphasis ours.)

In 4 Labatt's Master & Servant (2nd ed.) 4434, 4440, 4441, Sections 1487-1488, the author discusses the delegation

of personal duties to an independent contractor, and the opposing views on the subject, as follows:

. "As regards the case in which the liability of a master for the default of an independent contractor in discharging a non-delegable duty is in question, they are so conflicting as to render it impossible to formulate any definite doctrine upon the subject. . . .

"Whichever of the antagonistic views of the nature of the master's liability be taken, it is manifest that the general principles which determine the extent of the responsibility of an employer for the acts of an independent contractor involves the corollary that the owner of premises cannot dictate that his building shall be constructed of improper materials or upon an unsafe plan, and escape liability for injuries caused thereby because he made a contract with a third person to build it; nor can he, with knowledge of a weakness or defect threatening the strength of the building, set a man at work immediately under it, and shift all responsibility upon the builder. Similarly it has been held, on the ground that the physical conditions created by the negligence are the necessary result of the work contracted for, that an employee of a street railway, which is relaying its rails under a municipal permit, may recover for injuries, due to an obstruction in the track. . . .

"The writer has no hesitation in saying that he considers the cases absolving the master from responsibility for the negligence of an independent contractor in this connection have been decided upon a false theory of the circumstances involved. It is a contradiction in terms to speak of an absolute duty as being susceptible of delegation. If it can be delegated in any particular instance, it ceases, *ex hypothesi,* to be absolute. That this is a necessary corollary of the theory that a duty is absolute has been fully recognized in many English and American cases, where the complainant

was a stranger. Why a different principle should be applied where the injury is received by a servant of the party subject to the duty is not apparent, and no court has yet furnished any reason for making such a distinction. On the other hand, there is a consideration which points very strongly, if not conclusively, to the conclusion that the case of a servant is precisely the one in which the courts should be most unwilling to allow the interposition of a contractor to shield the master."

See note in 20 L. R. A. (N. S.) 793, where authorities on this point are collected.

The testimony was conflicting on the point as to whether or not there was negligence in the choosing of the rig tree, which was said to be sound, whether there was negligence in using these particular cables for guy wires, they being said to be unsound, and whether or not the "skidder" was negligently operated by jerks and starts in order to hoist the log that pulled down the rig tree. The evidence was likewise conflicting on the point as to whether or not the guy wires snapped first, throwing the entire weight of the suspended log on the rig tree, causing it to break. The jury had the right to believe that negligence existed in these particulars and we are not warranted in disturbing their finding.

It is contended by defendants that though Putnam Lumber Company was a participator in the act of loading logs on the trucks, yet plaintiff Berry was not injured when backing his truck under a log or in pulling it forward, but plaintiff's truck was parked outside the danger area, that plaintiff left it and walked into the danger zone where he had no business to be, and that in returning from that area to his truck he was struck and injured by the falling rig tree. Plaintiff, on the other hand, introduced testimony to show that though it was true he left his truck to enter the danger area, yet

he was called there by McKenzie, driver of the lead truck. Plaintiff had never been to this particular logging place before. When the operator of the "skidder" tried unsuccessfully to hoist the log that ultimately fell with the rig tree, he stopped the "skidder" in order to work on it awhile. During this interim plaintiff was called down to McKenzie's truck by McKenzie to talk to him about the best way to return to the plant of the Putnam Lumber Company after the trucks were loaded, which was entirely within the scope of his employment. As plaintiff turned to walk back to his truck, the "skidder" was started again. The operator did not wait until plaintiff had retired to a safe distance before lifting the log, but lifted it at once, while plaintiff was returning to his truck, pulling down the rig tree and injuring plaintiff. Under this view of the conflicting testimony, plaintiff had a right to be where he was when injured, and the jury by their verdict have so found.

"It is but another expression of this principle to say that if, according to previous knowledge and experience, the work which the proprietor engages the contractor to do is *inherently dangerous* to third persons, and *likely to lead to mischief,* however carefully performed, it will be incumbent upon him to foresee such mischief, and to take precautions against it. The Supreme Court of Ohio have, in official syllabus, stated the rule to be that one who causes work to be done is liable for the acts of employes of an independent contractor, where the resulting injury, instead of being collateral and flowing from the negligent act of the employee alone, is one that might have been anticipated as a direct or probable consequence of the performance of the work if reasonable care was omitted in the course of the performance. Other courts have stated the doctrine in sub-

stantially the same way." 1 Thompson on Negligence (2nd Ed.) 529, Sec. 652.

The jury could reasonably have found all defendants guilty of negligence. Defendants Rauleson and Adkinson were guilty of negligence if they picked an unsound rig tree, if they used unsound guy wires, if the "skidder" and engine were of inadequate size and power, or if they attempted to hoist the logs by racing the motor of the "skidder" and then lifted the logs by starts and jerks, and this action caused or helped to cause the rig tree to fall. Putnam Lumber Company was under a duty to see that its employees had a reasonably safe place in which to work, and this duty could not be contracted away by hiring Rauleson and Adkinson to load the trucks. The reasonably safe place to work included reasonably safe instrumentalities with which to do the work. The Putnam Lumber Company could not leave to Rauleson and Adkinson alone the sole duty of inspecting the rig tree, the guy wires and other necessary equipment, but owed the duty to the men working for the company to inspect these instrumentalities before the work began, and at reasonable intervals thereafter to determine if wear and tear had rendered them unsafe. The act of McKenzie, driver of the lead truck, in calling Berry over to his truck to discuss the return route with him, and the act of plaintiff Berry in going to McKenzie, was in conduct of company business. And if Berry was injured there or while returning to his truck after this conversation, the Putnam Lumber Company could be held liable for placing him in this dangerous position where, due to defective equipment or improper operation thereof or a combination of both, coupled with Putnam Lumber Company's failure to inspect the equipment either at installation or at reasonable intervals thereafter, the rig tree fell resulting in plaintiff's injury.

In 4 Thompson on Negligence (2nd Ed.) 1019, Sec. 5003, the rule in regard to the joint operation of the same plant by two masters is stated as follows:

"In case of joint operation of the same plant or property by two masters or proprietors, if a servant is injured through the negligence of either, both may be liable, and one may be liable for the negligence of the other. Thus, where the putting of a heater in a distillery was the joint undertaking of the distillery company and the makers of the heater, both companies were liable to one of the servants of the distillery company, who assisted in the work by direction of its foreman, for an injury resulting from the breaking of a defective rope furnished for the work; and each company was liable for the negligence of the other."

The declaration was sufficient to state a cause of action against the three defendants. It is not necessary that each be guilty of the same acts of negligence in order for them to be sued together as defendants, but it is necessary that each be guilty of negligent acts, either of omission or commission, which together concurrently contribute to the injury or injuries complained of. In this connection see 45 C. J. 895, Sec. 467; Louisville & N. R. Co. v. Allen, 67 Fla. 257, 65 So. 8, L. R. A. 1915C 20; Nichols v. Rothkopf, 135 Fla. 749, 185 So. 725; Barnes v. Liebig, 146 Fla. 219, 1 So. (2nd) 247. It is sufficient if the declaration contains an allegation of the particular act or omission causing the injury, coupled with the allegation that it was negligently done or omitted. Woodcock v. Wilcox, 98 Fla. 14, 122 So. 789.

Defendants rely upon a release signed by Mr. Berry as discharging them from liability in the case. The release was signed by Mr. Berry in the offices of the Putnam Lumber Company. Present at the signing were Mr. Berry and his wife, Dr. Davis, physician for the Putnam Lumber

Company, Mr. Coffee, who brought the release, and Mr. Allen, deceased at the time of the trial. All those present except Mrs. Berry had interests adverse to that of Mr. Berry.

The evidence is conflicting as to Berry's condition at the time that he signed the release; but there is ample evidence, if believed, to show that at that time he was a drug addict. He was injured in February of 1937 and the release was signed in August of that year. After his injury he had been treated in an Ocala hospital, then later had been taken to the company hospital in Shamrock. In June he was taken to Jacksonville for further operations and treatment, remaining there for eighteen days. He then returned to Shamrock, and in August signed the release. After that he went to Alabama to have a surgeon of his own selection, and paid for by him, remove parts of decayed bone that had been left by preceding surgeons. There was testimony that during most of the time from his injury until he left for Alabama, plaintiff was taking, under the direction of Dr. Davis, the company physician, large doses of sedatives, the principal one of them being nembutal, a member of the barbiturate group. This drug operates on the patient by depressing the cerebral cortex, which is the seat of the conscious mind, the will, the judgment, the intelligence. There was testimony to show that an ordinary dosage of this drug would be two or three of the 1½ grain capsules per day. There was testimony that prior to signing the release, plaintiff had been dosed with this drug for approximately six months, and had for the two months immediately preceding the signing been taking on an average of six to eight of these capsules daily. After signing the release plaintiff went to Alabama where, after his operation, he had to be committed to an insane asylum in order to be cured of the dope habit. Addiction, according to the Manual

of Pharmacology by Sollman (5th ed.) 737, introduced in evidence, "is fairly readily acquired and may lead to chronic poisoning, confusion, mild dementia, debility, atoxia, gastrointestinal irritation, anemia and hematorphyrin." Just before going to the office of the Putnam Lumber Company to sign the release, plaintiff's wife and brother-in-law had to give him a nembutal, which he followed by another one before leaving the house. When in the office of the company for the purpose of signing the release, Berry never said anything but, "Read it to me," so far as any witness remembers. Then when plaintiff got back in the car to return home, he fell asleep on the way.

It is claimed that the release here is valid when obtained under these circumstances. A release procured from a releasor with knowledge of his mental incapabilities, incapacity or incompetency, or of his bodily and mental incapacity, is fraudulent and voidable, although the arguments and tactics employed in securing the release would not be sufficient to constitute fraud as applied to a person possessing his normal mental powers. 53 C. J. 1224, Sec. 39; see Mensforth v. Chicago Brass Co., 142 Wis. 546, 136 N. W. 41, 512, 135 A. S. R. 1084. On this conflicting evidence, the jury was entitled to take the view that plaintiff was incompetent to execute a release at that time, and we will not disturb that finding. See 23 R. C. L. 418, Sec. 49.

The defendants would be entitled to credit on the final judgment of the amount paid Berry for this invalid release. The court so instructed the jury, and it must be presumed that they considered it.

The fourth question presented is whether or not the court erred in admitting the deposition of Dr. Slaughter and in excluding the deposition of Dr. Lyerly.

It is claimed by defendant Putnam Lumber Company that the court erred in excluding the deposition of Dr.

Lyerly, and it is contended by defendants Rauleson and Adkinson that the court erred in admitting the deposition of Dr. Slaughter. Both of these doctors lived in Jacksonville, and both had plaintiff Berry under their observation while he was in the Jacksonville hospital, June 1-18, prior to signing the release. The basis of the contention by defendants that the court erred in this particular is Section 47 of the Chancery Act of 1931, Sec. 4921 (3), C. G. L., Perm. Supp., which provides that in taking depositions of this character reasonable notice must first be given in writing by the party proposing to take the deposition to the *"opposite party of record."* Putnam Lumber Company notified plaintiff Berry that it was going to take these affidavits, but it failed to notify its co-defendants Rauleson and Adkinson.

The "opposite party" as used in an Illinois statute providing that when notice is served to take a deposition on written interrogatories, the "opposite party" may elect to have it taken on oral interrogatories, means a party on the opposite side of the action and not a co-defendant or a co-plaintiff. Cornwell v. Bloomington Business Men's Association, 163 Ill. App. 461.

The wording in our statute is clearer than it is in the Illinois statute. In the Illinois statute it is "opposite party," while in our statute it is "opposite party of record." These words in our statute mean those who are plaintiff or plaintiffs where a defendant is given the notice, and *vice versa;* and it does not include a co-plaintiff or a co-defendant.

Therefore, this being true, the court did not err in admitting the deposition of Dr. Slaughter over objections of co-defendants who were not given notice of the hearing.

The refusal of the court to admit the deposition of Dr. Lyerly may have been technical error, but was it harmful? The purpose of this affidavit according to the brief of Putnam Lumber Company was to show that plaintiff Berry·

was mentally competent to understand what he was doing when he signed the release.

The affidavit of Dr. Slaughter, already in evidence, was on this identical point, that of the mental competency of plaintiff Berry when he signed the release, and the affidavit of Dr. Lyerly would have been cumulative, or in corroboration of evidence that the jury already possessed on this point in Dr. Slaughter's affidavit.

Then, too, almost two months time had elapsed between the time plaintiff Berry was discharged from Dr. Lyerly's observation and the time he signed the release; and there was testimony to the effect that plaintiff was taking six to eight nembutal capsules almost daily during that time. This, if true, would have been sufficient to negative the value of Dr. Lyerly's affidavit; because there was competent testimony to the effect that such dosages of nembutal for a period of two months would affect plaintiff's mentality. This would render the probative value of such affidavit practically worthless. The fact that plaintiff's mental condition at the time he signed the release as testified to by several of defendants' witnesses who were in a better position to know such condition at that time than was Dr. Lyerly, would make the matter in the affidavit of Dr. Lyerly merely cumulative, even if it had probative value, and would render any possible error in excluding it, harmless.

No harmful error of law or procedure having been made to appear by the record in the proceedings leading to the judgment below, the judgment is therefore affirmed.

Affirmed.

WHITFIELD, TERRELL, BUFORD, CHAPMAN and ADAMS, J. J., concur.

BROWN, C. J., and THOMAS, J., dissent.